Thanks for being here, Council. United States of America v. State of Delaware Department of Insurance. You may proceed. May it please the Court, James J. Black III, on behalf of the Delaware Department of Insurance, I'd like to reserve three minutes of my time for rebuttal. Okay, that's done, and I should have, right at the outset, checked. Judge Rendell, you can hear us fine? I can. You can hear me? Yep. Thanks. All right. Thank you. Ms. Black, please proceed. Thank you. Today, this Court addresses a nationally important issue of insurance regulatory law, the conflict between, on the one hand, Section 6920 of the Delaware Insurance Code, a statute which expressly directs Delaware's insurance commissioner to keep confidential certain information supplied by insurers, information supplied in connection with their application to be licensed, and information supplied related to the commissioner's examinations into their ongoing fitness and reliability. Right. We're well familiar with the case, so you don't have to give us any background on it. Let's jump right into it and have you explain to us why you're running so hard away from SABO. Is it because you have some inclination that if SABO is good law that you guys, you lose? Do you lose if we say, you know, SABO's the law? That's what we've got to follow. SABO, of course, was decided before the Supreme Court's articulation of the McCarran-Ferguson standard in Humana v. Forsyth. Yeah, we're going to get to that, so please work with me. I've just asked you, if we say that SABO is good law, do you lose? No, because the court, in addition to imposing a threshold test that would be contained within SABO, also applied that test incorrectly, even disregarding the way that SABO said it should be applied. The court applied, confused the antitrust standards, confused the relationship between insurer and insured, and used that in that filter to basically turn the funnel upside down and say, if you can't... SABO says you first look at the challenge conduct, right? That's the first step. You say to yourself under 1012A, what is the conduct that's at issue? Is it conduct that falls within the ambit of the business of insurance, right? And if it's SABO... That's the first step in a SABO analysis, right? Right. Two things about, because Your Honor brought in up 1012A. SABO is, of course, the only case, the only circuit, as the IRS concedes in their brief, that discusses a 1012A filter. Yeah. It's our precedent. It's our precedent. Not after Umana announced that the test for McCarran-Ferguson is the three-part test that Umana v. Forsyth established. And this court... Did Umana even mention SABO? Did it mention 1012A? Did it get into that at all? It rejected what the Ninth Circuit was urging and had happened at the lower court, which was... Which were tests that were in 1012B, right? It's the same... You've just said, and I think it's accurate, we're the only circuit that said, look at 1012A. That has some meaning. It has meaning. And the meaning it has is what we've just discussed a moment ago. You ask yourself what the challenge conduct is, and that's a 1012A question. No other court's done that. So certainly, Humana wasn't addressing it because it wasn't addressing 1012A. It was addressing 1012B, right? It was the same standard, Your Honor. The Ninth Circuit had adapted the very same words, the very same filter that was... And the IRS in the... So you're saying we weren't such an outlier. No, Fabi was arguing that that's what should be applied. Humana adopted Fabi as the analysis. Fabi dealt with this very filter, this very idea that there was something other than the three-part test. That the court in Humana with precise language said that the McCarran-Ferguson test, not the 1012B test, the McCarran-Ferguson test for determining the conflict would be enunciated in the three parts. Okay. I understand your argument on that, and I'd like you to stick with what I've been asking you. If we thought SABA was the law we had to follow, and we started with the 1012A analysis and asked, is the conduct the business of insurance, how is refusing to comply with the federal subpoena the business of insurance? Because that's the conduct we're dealing with, right? What the inquiry is under not only the Supreme Court's decision in Humana, but this court's subsequent decision in Souter, through the insurance brokerage cases that Judge Sirica was the author of, indicates that the test under McCarran-Ferguson is whether or not the aim, the purpose of the statute is to regulate the business of insurance. Now you're talking about a 1012B. I'm trying to get you to focus on 1012A, and I apologize if I'm not doing this in a way that's clear to you. I'm not getting it, Judge. I'm trying to get you to focus on 1012A. Now you're talking about the 1012B inquiry about what the law is doing. If I understand SABO, and you can correct me if I'm wrong about this, but I think SABO says under 1012A, look at the conduct, and if the conduct fits within the ambit of the business of insurance, then we're in the zone where you'd ask the question about McCarran-Ferguson reverse preemption. But if it isn't in that ambit, don't think about, then we're not even talking about reverse preemption. Am I correct in my understanding of SABO? You're correct, Your Honor, except for this. What SABO said was if it's wholly unrelated to the business of insurance. Okay. But it's focused on the conduct that's at issue, right? So focus on the conduct, and please answer for me how refusing to deliver documents is conduct that fits within the ambit of the business of insurance. It's not the refusal to deliver documents. It's the aim, purpose of the statute. Now you're not looking at the conduct of the insurer. You're looking at the conduct of the commissioner in refusing, by the legislature telling the commissioner that information that is supplied, that is critical to the determination of the reliability and fitness of that insurer. You don't think that the conduct here is, I mean, the conduct that's at issue here happens to be the conduct of the department, but you're saying because it's the conduct of the department, we're not even going to look at 1012A? We're going straight to the 1012B inquiry? Your Honor, I do not believe that when the Supreme Court said, this is the test of McCarran-Ferguson, it forgot to mention that there was another filter under 1012A. 1012A protected, protects. I've got to interrupt you because you're fighting me here, and I don't understand why. You want to talk about this. We've read your briefing. I understand that. I'll be quiet here in a minute and let my colleagues talk, and they can get into this. You can tell us all the reasons why you believe Yamana overrules implicitly SABO. That's fine. But I really want you to answer the question that I'm trying to get put before you, which is if we took SABO to be our law, and we had to stick with that, and we asked ourselves what's the conducted issue, what would the conducted issue be? Tell us what the conducted issue would be that we have to address. It would be information supplied by the insurer to the insurance department that is. . . That's not conduct. I assume the conduct, the defendant's conduct here is the assertion of the confidentiality statute as something that prevents them from producing the documents. It's the assertion by the commissioner of, whoa, I'm not going to comply with this subpoena, because we've got this confidentiality statute. So let me go one step further. We have a confidentiality statute. All it does is say, commission, when somebody gives you confidential documents, you have to maintain the confidentiality. Now, how under the test of either Perrano, national securities, how do you fit that statute and the conduct it allows, that is the prevention of disclosure, how do you fit that with any of the prongs of any test that has been laid out for the business of insurance? Your Honor, you're citing to the prongs of the business of insurance that only apply under the antitrust portion of McCarran-Ferguson. Well, what do you contend the test is that you meet? The three prongs that were announced in FABI, that were reiterated in Humana versus Foresight, that were then cited. And what are they? And how do you meet them? The Humana-FABI steps are that the state statute was enacted for the purpose of regulating the business of insurance, that the federal statute does not specifically relate to the business of insurance, and that the federal statute would invalidate, impair, or supersede the state statute. Those are not tests for what the business of insurance is. And you said that Perrano is only about antitrust. Why do you think that the Perrano factors to help you understand what's the business of insurance are only applicable when you're asking what the business of insurance is in an antitrust case? The Perrano factors are focused on the narrow interpretation of the antitrust provision of McCarran-Ferguson. As the courts have said, including this circuit, has said many times, the category of laws enacted for the purpose of regulating the business of insurance, laws which have the aim, purpose, or intent of regulating insurance, are a necessarily broader category of laws than the business of insurance under the antitrust statute. If you think there's a difference, then please answer Judge Rendell's question and tell us what you think the test is for the business of insurance. By naming the three things named or set out in FABE, and I don't know if I'm saying it correctly either, but that's how I'll say it, FABE, you've described the 1012B test that the Supreme Court laid out. But that doesn't speak to the definition of what the business of insurance is. If you don't like the Perrano factors for describing the business of insurance, what do you like as an analytical tool for figuring out what the business of insurance is? The broader character of laws that govern and that case laws say, licensing and reliability fit within the broader category of laws. Not the antitrust, not the narrow antitrust focus. I see that I'm out of time, Judge. Please, this is, yeah, we got probably a lot of questions. You're on our time now. Very good. Thank you. Even if you say licensing and reliability, how does this statute which tells the commission how to handle, to render confidential what has been submitted as confidential, how does that have anything to do with licensing and reliability? The aim and purpose of this statute and the confidentiality portion of this, it's uncontested by the IRS, that the purpose of the confidentiality in the licensing statute is to encourage the insurer to be absolutely forthcoming with the information that it supplies to the insurance commissioner. So the essential regulation of insurance that the commissioner undertakes, which is to one, determine whether or not the insurer is fit to be licensed, and then two, 6920 incorporates Title III, which is the examination statute, which goes on to all the ways that the financial examination is conducted. All of that information is intended to be confidential and kept confidential, except under very specific exceptions. If the insurer allows it to be released, it can be shared with law enforcement, it can be shared with other regulators, so long as they execute the confidentiality provision. The IRS refuses to do so. What case says reliability of information is the business of insurance? I thought really the business of insurance focus was on the insured and insurer relationship, not on reliability, but you can tell me I'm wrong. Yeah, sure. Respectfully, Your Honor, that is the antitrust test. It is inapplicable to the ‑‑ Is there anything that says that the Perino factors apply only in the antitrust area? No, they're a starting point. But the issue is that's the narrow antitrust point, and we already know, it's been the law of the circuit since Tycor, through Souter, through brokerage, the brokerage cases, it has been that there is a broader categories of law that have the aim or purpose to regulate insurance. So if we turn the filter upside down, if we use the narrow definition to stop, which is what the lower court did, never got to the three factors that this circuit, Souter, and referred to, never got to them because they used that narrow inappropriate test to stop it right there and say, well, these don't relate to the business of insurance, using the definition of business of insurance that's in the antitrust. And I guess what I'm asking is, do you have a case, something that says those Perino factors, those don't apply outside the antitrust? I don't say they don't apply. I say that I do have a case that they are that. It comes second is your position. The Perino factors are a starting point that you'll look at. But they would, by definition, they would screen out information that laws that are in the broader category, which is what national, which in rate brokerages. Excuse me, Your Honor. I didn't answer your question directly. The answer is national security. The national securities case is specifically said that the activities of insurance companies that rate so closely to their status as reliable insurers must be placed into the core of the business of insurance. I should also point out. I keep relying on Souter. In Souter, we assumed for our purposes that it was the business of insurance. We did no analysis in Souter of what the business of insurance is. Do you understand that? I do, Your Honor. And I would also point out that since we talk a lot about SABO and also in Highmark, that was not determinative in that case either because although the court, SABO was pre-Highmark. There was confusion and there were cases using the four-part test, meaning the filter before you get to the three-part test. In SABO, they didn't use the filter, the narrow end of the funnel, to filter out the broader test. In both SABO and Highmark, which are relied on by my friends at the IRS, that was not determinative. Everything flew through. But what using the wrong test can do, as it does in this case, is use the narrow end of the funnel to basically eliminate what is the Supreme Court and this circuit's articulated standard. You bring us back to the question I was working with you on at the beginning. Are you pushing hard against SABO because if we apply SABO, you can't win because we're going to say it doesn't look to us like the challenge conduct is really the business of insurance. It's a fight over whether or not to turn money over, I mean turn documents over, turn information over. But it's not the business of insurance. Your Honor, I do not say that SABO can be applied. It shouldn't be. It can be applied. And how do you win? How do you win if SABO is applied? Run me right through the analysis starting with 1012A. I think you have to look at the conduct that is being regulated under 6920, which is the submission of information associated with licensing and examination, a core function of the insurance department in establishing fitness. Here's where I think we're, I guess I'll let go of this, but here's where I think we're having a problem. Every time I talk about the conduct that's at issue, you start talking about the conduct that's to be regulated by the statute, which the conduct to be regulated by the statute seems to me to be the 1012B point. Like what does the law do? And we're not asking what the law does. We're asking what the conduct that's being challenged is. And the conduct being challenged seems to be you won't turn over information. It's the conduct of the commissioner. And you can say it's conduct dictated by the law. I understand your argument. But the conduct seems to be we're not giving you this information. That's what the fight is about. Am I just confused about that? Your Honor, it would be my view that if you were to submit, that if you blue line, blue ink out every context that this is 6920 of the insurance code that seeks specific types of information as opposed to licensing and examination, and that it is that information which there is a confidentiality provision which has a recognized proper purpose, which is to promote transparency between the insurer and its regulator. If you blue line all of that out and say I'm only going to take the phrase that says and is directed by the legislature to not produce it and say that's the only conduct going on here, I think that's true. But I don't believe that that is an analysis as to whether or not it is wholly unrelated to insurance, which is what SABO said. The problem with the lower court is that they did just that. Having cited SABO, they then ignored SABO's guidance that when looking at it, it had to be wholly unrelated because we would have the problem that we have here. We're using 1012A. We're using SABO uniquely to filter out the entire purpose of the 1012B analysis. The Supreme Court clarified. Sorry, Your Honor. You said it promotes transparency between whom? Between the insured and the regulator? No, the insurer and the regulator. Where does the regulator fit in the business of insurance? Isn't the business of insurance more relating to the insurer and the insured? No, Your Honor. Where does the regulator fit in that equation? Laws enacted for the purpose of regulating the business of insurance, by definition in this circuit and in the Supreme Court, encompasses a much greater body of law than just the insurer-insured relationship. Your Honor, that's in many of the cases. But you're under B again. You're under B again. You say laws enacted for the purpose of regulating. That's not where we are. We're still saying under SABO, you're contending that you win because they misdefine business of insurance. But my question to you is, where does a law that has to do with what the regulator does, how does that constitute the business of insurance? And I'm looking at national securities. Where is it that national security says that this type of transparency is part of the business of insurance? At page 460, Your Honor, national security says, activities of insurance companies that relate so closely to their status as reliable insurance must be placed in the core of the business of insurance. Relationship between insurer-insured, the type of policy. Relationship between insurer and insured. Yeah, Your Honor. The type of policy which could be issued, its reliability, interpretation, and enforcement, that has to do with policies, the type of policy. It still has to do with an insurer and an insured situation. Congress was concerned the type of state where it centers around the contract of insurance, the transaction with Paul v. Virginia Health Business Commerce, the relationship between the insurer and insured. The type of policy. The reliability of the policy. Interpretation and enforcement. These were the core. Your Honor, national security, national securities, where it said activities of insurance companies that relate to their status as reliable insurers. And licensing, I'll find a case for you, licensing has been recognized as one of those core regulatory issues. National security stands for the proposition that reliability is important. Licensing. Protecting or regulating this relationship, this relationship, insurer and insured. Okay, I see what you're pointing at. I don't necessarily agree with your point, but I see that's helpful. Okay. Any questions? Any other questions, Judge Rendell? No, I'm good. Thank you. All right. You look like you're very eager to say one more thing, Mr. Black. Go ahead. Thank you, Your Honor. I appreciate the opportunity. This is the textbook case of the application of McCarran-Ferguson. All the cases that we talked about, Humana versus Forsythe, Humana refers back to, of course, Fabie, where Fabie did a very careful walkthrough of the differing purposes of the McCarran-Ferguson Act in order to give honor to the relationship between federal statutes and state statutes. Okay. It is absolutely inappropriate to use a narrow filter before we get to a determination as to whether the plain language of the McCarran-Ferguson Act can be effectuated. If I could just point out that I'm here, of course, on behalf of the Delaware Department of Insurance, but the amicus has pointed out that if this filter is applied, if this funnel gets reversed and we disregard that three-part test that's in Humana versus Forsythe adopted by the circuit thereafter, whole swaths of insurance regulatory law gets turned on its head. Really? There are many, many activities. I'm trying to think of how that would be as being not a conflict between 6920 and 1012, but as a particular instance of a state government refusing to provide information. Then the entire edifice of state regulatory law falls apart. That seems a little dramatic to me. Let me just give you an example. The policy argument I understand from the amicus and from you, the amici in you, is this doesn't make any sense because they can just get this from the insurers anyway. They could go direct to the insurers and get this information. If that's true, then what's the point of this fight? Why are you saying this is the end of the world as we know it if the same result could be achieved by walking around you? That wouldn't take down the whole world either. I think the decision not to pursue the insured, the insurer, the captive manager, or any of the professionals for the same information, simply shows that we don't seek to protect the information, only who they get it from. Our insurance commissioner, in the promotion of the regulatory transparency, was directed by this state legislature to produce that information only upon certain. If I understand the position you've got, it's that somehow if you turn this over, it means you won't be able to trust the information you get from insurers. They won't be willing to come forward and give you information. I agree that there is a legitimate and recognized purpose for confidentiality statutes, whether it's banking. We cite these in our brief. They're unrebutted, frankly, in the IRS's brief, that there is a legitimate purpose of assuring confidentiality between a regulator and the person, corporation, bank, insurance company that regulates to promote that transparency that that's a legitimate purpose. I don't think that's the drama. That isn't an issue. What I'm dealing with here is the point you were hitting at the end, which is this is going to crater everything if you don't see it our way. No, no, Your Honor. I don't think that's the point. The point is that the use of the wrong test filters out many, many regulatory statutes that have the aim, purpose, and intent of regulating the business of insurance, but if you use the improper antitrust analysis and look at conduct, conduct can be determinative in an antitrust analysis, as the cases say, but conduct is really not what's at issue here. So that's why looking at the insurance commissioner's conduct is really far afield. Okay. That's the point, Your Honor. There are investment laws. There are things that are in that insurance code that are – We got you. If you blue line it out too narrowly, MFA goes on its head. We'll have you back on rebuttal. I appreciate that. Thank you very much for your time. You're from the United States government. Good morning, and may it please the Court. I'm Francesca Ugolini, Counsel for the United States. The McCarran-Ferguson Act was enacted to avoid unintended federal interference in the state's traditional regulation of insurance business, but neither states nor insurance companies have ever enjoyed, either before or after the enactment of the McCarran-Ferguson Act, immunity from federal tax investigations. Well, and I don't think they're suggesting they are immune from that. So why don't you get right to the discussion that Mr. Black and I were having and tell us why he's wrong, and specifically begin with the assumption that we thought we were bound by SABO. If we thought we were bound by SABO, is it accurate to say that even in doing that, the district court here applied the wrong test because it focused on the more narrow filter that's applicable only in antitrust cases? No, the district court did not apply the wrong test. If we're assuming that SABO still is good law, which I think it is, and I'd be happy to walk through the decisions, including Humana, from this court following Humana, the district court here properly looked at the Pereno factors to inform the inquiry whether the challenge conduct in this case broadly constitutes the business of insurance. And this comes directly from the SABO case. I have the citation here, 137F3rd at page 191 and footnote 3. This court went through the royal drug and Pereno factors and acknowledged that while this inquiry was directed to the antitrust clause in section 1012B, it may nevertheless provide guidance in a more generalized analysis under this act. Can that be squared with the language of FABE itself where it says, quote, both royal drug and Pereno involved the scope of the antitrust immunity located in the second clause of 1012B. We deal here with the first clause, which is not so narrowly circumscribed. In other words, business of insurance might have a different meaning depending on what clause you're in. I don't think that's what FABE held. I think FABE held business of insurance carries the same meaning throughout the statute, but the way it's— Clearly that isn't what it held because the dissent took them to task on it and said it should mean the same thing in the statute. You can't be switching it around clause to clause in the statute. That was Justice Kennedy's pushback. And it was a pushback that Justice Blackmun and the majority rejected and said, oh, yeah, we can. So clearly they thought there was a different meaning in different clauses, right? I would respectfully disagree with that. I think the majority's response to the dissent's point was that the phrase appears in a different context in the first part of 1012B because the phrase they were interpreting in FABE was whether the state law was enacted for the purpose of regulating the business of insurance. So that invited a broader inquiry. Was the law enacted for the purpose of regulating conduct that constitutes the business of insurance? But that subset of the phrase, business of insurance, carries the same meaning whether you're looking at an antitrust case or a non-antitrust case. Okay. Does national securities help or hurt you? I think national securities helps us because it provides the support for this court's test in SABO, and I think that comes across clearly from the court's analysis in SABO. In national securities, the Supreme Court reiterated that Congress did not intend to cede the entire field of insurance regulation to the states. So just because the state can draw a line between, you know, this is a statute that affects insurance companies or involves insurance regulation in some way, it's now covered by the McCarran-Ferguson Act. The Supreme Court rejects that. In national securities, I say, undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. So it's kind of ceding to the argument of Mr. Black that, you know, if this confidentiality is really close to the reliability, and this, again, is at 460, maybe that is the business of insurance. In this case, both the magistrate judge and the district judge, though, rejected the notion that the confidentiality statute is so closely related to ensuring the reliability of insurers that it could fall within the ambit of the court's statement here. But we could disagree with that, could we not? I suppose. I think it still doesn't pass. I mean, I think this discussion in Fave, however, is talking about 1012B, and it's talking about the part of the test, whether the law was enacted for the purpose of regulating the business of insurance. But you would have to get past this court's threshold test in Sabo, which asks whether the challenge conduct at issue in this specific case, so not the state law, but the challenge conduct, which, as Judge Jordan correctly pointed out, is the state's refusal to provide documents, its insistence that it must retain these documents as confidential and cannot provide them in response to the IRS summons, whether that challenge conduct broadly constitutes the business of insurance. Well, here's how Sabo put it, and Mr. Black hit this adverb a couple of times. It says, if the contested activities are wholly unrelated to the insurance business, then the MFA has no place in analyzing federal regulation. How do you get past the word wholly? Is it really your position that, you know, even if this is a tenuous thing, it's got nothing to do with it? What are we to make of the adverb wholly in Sabo? I mean, I think in Sabo, I don't think the court was stating its test when it said, I mean, surely, you know, if the conduct at issue is wholly unrelated to the business of insurance, that makes for a really easy case. Clearly, the threshold test is not met. But the actual test that this court stated in Sabo was whether the alleged conduct at issue broadly constitutes the business of insurance and, therefore, is subject to state regulation under 1012A. So it's obviously an easy case if it's wholly unrelated to the business of insurance. You know, the closer you inch towards possibly having something to do with the business of insurance, that makes it a more difficult question. But wholly unrelated is not the threshold test. Why not? Why would we not pay attention to that language? When it says the language you just quoted, and it says broadly stated, is broadly sort of a flip side of saying wholly unrelated, or you can think of it as broadly covering? I mean, in both instances, you're trying to say, give this a real broad construction, what the business of insurance is, right? Like, think of it big scope. I don't think that's how this court interpreted the threshold test in Highmark. That's the 2001 case that postdates Humana, where the court also applied the threshold test, and it restated the test as whether the challenge conduct broadly constitutes the business of insurance. Do you agree that if we follow SABO, that we are then denuding subsection B? In other words, we find that a statute does not constitute the business of insurance. But yet, and then we're foreclosing the inquiry under B, that if it was enacted for the purpose of regulating insurance, and if the federal law doesn't specifically relate to the business of insurance, that would give the state law preemption. But we've already axed it under A. Do you believe that SABO was properly decided? I do think it was properly decided, and the way I interpret this court's decisions and the way they line up with the antitrust cases is essentially sort of three levels. I think the antitrust case, and this court, I think, recognized this in SABO when it recognized that the Pareto factors and the antitrust test, you know, that in FABE, that was held to be a more narrow inquiry. So that doesn't necessarily dictate the outcome of the test under A, but it provides guidance. So I think at the antitrust level, you have the most narrow version of the test. I think at the threshold, the threshold test that this court announced in SABO is somewhat broader because the court did say broadly constitutes the business of insurance. And then the test under B for the purpose of, you know, whether a law was enacted for the purpose of the business of insurance is possibly broader than that. So I do. So doesn't the idea that you can be axed, if you will, under A, where under B your state statute would preempt federal law, and this is Mr. Black's argument, that the narrow focus under A does away with the opportunity under B, does it not? That is not what this court determined in SABO. It took a very deliberate look at the statutes and gave meaning. It didn't look at the impact that a decision that federal preemption applies under A would do to something under B. Should we embank this to relook SABO? That would certainly be up to this court to decide, but I think this court has taken a close look at SABO multiple times over the years. Humana did not discuss this aspect of the statute at all and actually includes language that supports the application of this court's threshold test. Is there anything that's added by that threshold test? What does that threshold test do for us? If in Autry the sister circuit seemed to be saying that that's not doing any work, that you don't have anything that's the business of insurance that wouldn't be covered by laws aimed at regulating the business of insurance, right? I think it is doing work and I think this case is a perfect example because the point I was trying to make when I first got up here was that this case involves an IRS summons for documents. And both before and after the McCarran-Ferguson Act, it was always the case that state regulators, that insurance companies, had to respond to IRS summonses. I mean, unless there was some other privilege like attorney-client. The McCarran-Ferguson Act was never, you know, there's nothing about the IRS summons power that implicates the state's traditional role as an insurance regulator. And invoking the McCarran-Ferguson Act here to somehow override the IRS's longstanding summons power, this provision of the Internal Revenue Code that's been around since long before the McCarran-Ferguson Act, it simply doesn't make sense. And I think the threshold test gets to that core question of, are we in the world of laws that Congress thought, you know, might accidentally infringe on state's traditional role as insurance regulators? And the answer in this case is no. That's exactly the world we're in. We're trying to figure out what Congress meant when it said the stuff it said in the McCarran-Ferguson Act. So it doesn't feel like it advances the ball to say, well, clearly this wasn't it, because that's just an ipsy-dixit. The question is, when the state enacts 6920 and says, we're regulating these insurance companies, it's important for us to get clear and direct and accurate information from them. We will maximize our opportunity to do that if we promise them confidentiality. It seems like it's pretty clear that that's a statute aimed at regulating the business of insurance. Is it not? We would dispute that it is. And so now I think you're asking me about the test under 1012B. I am. And even if you're in the world of – and look, you know, the government, we believe that we win under either test. So if this court wanted to step away from its test in SABO – I'm not even talking about which test. I'm just asking you about 1012B. Right. 1012B, 6920 says, you get confidentiality, bare your soul to us, the insurance company. That's not about regulating the business of insurance. What's it about if it's not that? Is it about, like, the moon and the stars and the clouds above? What's it about? No, there is clearly a relationship to the field of insurance regulation and the state's role as an insurance regulator. But the Supreme Court's decision in FABE drew that connection – drew a line between anything that affects an insurance company does not necessarily count as a law enacted for the purpose of regulating the business of insurance. In the FABE case, the only part of the state statute that the Supreme Court held fell under 1012B was the bankruptcy priority that was specifically for policyholders. The Supreme Court said that part, the bankruptcy priority for policyholders, ensures that there's some performance on the insurance contract. So that part of the state law was enacted for the purpose of regulating the business of insurance. But all of these other priorities given to other creditors, creditors of an insolvent insurance company, these are outside the line, even though – Because they don't go to the insured in that case, right? Actually, yeah. Creditors who aren't part of that insured insurer regime. But here we are talking about that, are we not? Are we not talking about that, you know, you can say it's a ham-fisted, it doesn't really accomplish what they want, we don't think it's smart policy, but can you really say it's not aimed at regulating the business of insurance? I'd like to push back on the premise of your question regarding FABE because the Supreme Court in FABE did recognize that the priority for other non-policyholder creditors would redound to the benefit of policyholders because it might ultimately enhance the reliability of this company in liquidation. That's true. But held that it was too indirect. Stick with my question. Can you really say it's not aimed at regulating the business of insurance? It is not aimed at managing, controlling, or adjusting conduct that constitutes the business of insurance. And that is the test from FABE. Okay. I see my time is up unless the court has any other questions. We would just ask that you affirm the decision below. Okay. Judge Rendell? I'm good, thank you. All right. Thank you. Thank you very much. May it please the court. Thank you. You gave me a gracious opportunity to express myself in my initial time so I won't belabor my rebuttal. I was asked a question about the perennial factors and their application. Here I would just like to point out that Highmark in this circuit indicated that those perennial factors in a first clause case, that's what we're dealing with here, first clause, the business of insurance, and not the second clause, the antitrust, but the first clause. Highmark said that those perennial factors were difficult, if not impossible, to apply. Your Honor did address the other part of SABO. I had emphasized that SABO said that it was wholly unrelated. It also said that it had to be broadly determined. That's essentially what the problem was, what I call the second problem below, which is having cited SABO, the court went on to use an extremely strict and narrow filter and not even follow the next paragraph of SABO. Hold on, and why don't you, on that point, meet Ms. Uglini's final, her final argument, which is if we're paying attention to Humana and to FABE, then we will see that the court is not inclined to let that, let definitions of the business of insurance grow so wide that anything that touches insurance is off limits to the federal government, and here, it's just too attenuated. Yeah, so of course, in FABE, what we're talking about is a dead insurance company, right? We know what we're talking about, so talk to the point when you say, you've got to give this a really broad scope. How do we square that with the Supreme Court saying, well, it can't be too broad, because when you get out there on the outer margins, then you're talking about blocking the federal government from doing stuff it's entitled to do, like the IRS demanding a breach. Assert a priority for money against a bankrupt insurance company. Or like the IRS exercising its traditional summons power to get information related to tax and tax evasion, tax fraud, which is what, at bottom, this thing is all about, a suspicion that there are people abusing the system and that Delaware has set up a regime which is frustrating the IRS in its efforts to root out tax evasion and tax abuse. Again, there are exceptions and allowances that are built right into the definition of that statute. All the information they seek, they can get from anybody in the world except for the commissioner, and when they get it from the commissioner, they have to do what the statute says, which is agree to keep it confidential in accordance with the purposes of the act. There's absolutely nothing by which Delaware wants this. Delaware's insurance commissioner is charged with assessing reliability and licensing and then reliability of these insurers. The commissioner would be disappointed in me if I didn't repeat to this court what I've repeated before. We have no desire to benefit tax cheats. We're here to make sure that the purpose of the statute. Let me ask you this then. The premise of your entire argument is if we don't see this your way, then the state of Delaware will be negatively affected in its ability to get the information it needs from insurers because they will be afraid that their confidential information will get out. So you're positing an insurer that is so sophisticated that it knows the McCarran-Ferguson Act and is thinking, I may be a tax cheat, but I can count on the Delaware Department of Insurance to keep this information from getting to the IRS. It just seems kind of implausible, especially when you're saying in the next breath, they can get all this information anyway. There's a part of me that's wondering, what's the fight about? What's the fight about if the information's really freely available and there's no risk that a person will be less than forthcoming with the IRS when the commissioner would be forthcoming? The fight is about an insurance statute, a specific state insurance statute, that directs the commissioner not to provide the information except under the two circumstances, that it be either that it's authorized or that it be held confidential. It's the commissioner directed by the Delaware legislature to follow the insurance laws. The purpose of that confidentiality provision is well-known and accepted, that it promotes transparency between the insurer and the regulator in a key regulatory area. If we filter that out, we never get there. Okay. So you're saying it's not wholly unrelated to the business of insurance. It bears a sufficient relationship and that SABO could have been properly decided, but it was misapplied by the district court. Certainly, Your Honor, that's true. And if that, I would like to, I didn't get an opportunity to ask. We believe that the elements of the McCarran-Ferguson reverse preemption are present on this record and that this court can reverse them so far. We also believe that for one of the two reasons, either because the wrong test was applied or without the guidance, or even with the SABO test that it was applied inappropriately, it should be reversed and remanded. I also follow up on- We got you. Your Honor's question about unbunking SABO, that would be an alternative remand. Somehow I knew you would mention that. Thank you, Your Honor. Thank you. Thanks. We appreciate counsel's argument. We'll call our next case.